TEXTO COMPLETO DE LA SENTENCIA
El apelante Ismael Rodríguez González et al., acude ante nos de una sentencia emitida por el Tribunal de Primera Instancia, Sala de Arecibo, que desestimó una demanda en daños por impericia médica que éste instara contra el Hospital Metropolitano Dr. Susoni et ais.
Alega, en síntesis, el apelante que el foro de instancia incidió, primero, al dictar sentencia desestimando su *660 demanda por impericia médica; segundo, al no permitir contrainterrogatorio del Dr. González respecto a los casos en que había sido demandado previamente por impericia médica; y tercero, al conceder el pago de costas a favor del apelado Hospital Metropolitano Dr. Susoni.
Con el beneficio del estudio de la exposición narrativa estipulada presentada por las partes y sus alegatos, procedemos a confirmar el dictamen emitido por el tribunal de instancia, por ser conforme a derecho. Veamos.
I
Los hechos procesales del presente litigio tuvieron sus inicios el 29 de septiembre de 2005, cuando el apelante Ismael Rodríguez González Amparo et al., presentó demanda en daños y perjuicios contra el Hospital Metropolitano Dr. Susoni, Dr. Carlos González y otros. Sostuvo, en síntesis, en su demanda haber sufrido daños emocionales y angustias mentales por su condición de salud, causada por la impericia médica del Dr. González y el Hospital Metropolitano. (Ap. VI, págs. 41-47.)
Por otro lado, los hechos sustantivos del presente litigio, según determinados por el foro de instancia, comenzaron en septiembre de 2004, cuando el apelante Ismael Rodríguez González comenzó a quejarse de dolor abdominal. El 2 de octubre de 2004, tenía un dolor fuerte en el lado derecho del abdomen y fiebre, por lo que acudió a la sala de emergencia del Hospital Metropolitano Dr. Susoni en Arecibo. Luego de varios exámenes, incluyendo un sonograma que reflejó piedras en-la vesícula, le informaron que tenía que quedarse recluido en el hospital. El médico de sala de emergencia consultó al servicio de cirugía, estando de guardia el coapelado Dr. González.
El 3 de octubre de 2004, el apelante Ismael Rodríguez fue evaluado por el Dr. González, quien confirmó el diagnóstico de piedras en la vesícula y le recomendó cirugía, explicándole el procedimiento y los posibles riesgos y complicaciones del mismo, a lo cual consintió el apelante. El 4 de octubre se realizó la operación mediante cirugía abierta; dicho procedimiento fue uno difícil debido a la inflamación que existía en el área. Había piedras enormes impactadas en el lecho hepático y la vesícula estaba inflamada y gangrenada en opinión del Dr. González, por lo cual, éste procedió a dejar una mecha (8 “apenrose”), para que drenara cualquier colección de líquidos y pus.
Así las cosas, el apelante fue dado de alta por el Dr. González el 9 de octubre de 2004 con cita a su oficina el 15 de octubre del mismo año. En dicha cita, el apelante refirió una queja de dolor abdominal. Al continuar con el dolor, al día siguiente, el paciente fue admitido al hospital nuevamente. El Dr. González, sospechando que la herida estaba infectada, algo normal en casos infectados como el del apelante, ordenó tratamiento con antibióticos y un CT Sean. Se encontró inflamación sub-hepática y lo que aparentaba ser una colección de líquidos en el área. Luego de administrar antibióticos por varios días al apelante, el 21 de octubre de 2004 se procedió a examinar el área operada, entrando por la misma herida. Se encontró una colección de líquidos de alrededor de 200 cc, la cual fue evacuada, dejándose entonces otro “Apenrose” para que drenara cualquier líquido adicional que pudiera llegar al área.
El paciente mejoró y el 26 de octubre de 2004, por orden del Dr. González, se le realizó una prueba de radioisótopo llamada HIDA-Scan, que no demostró extravasación del área de la operación. Ismael Rodríguez continuó mejorando y fue dado de alta el 27 de octubre de 2004, con cita a la oficina del Dr. González para el 29 de octubre de 2004. En dicha visita, el doctor apelado encontró al apelante en franca mejoría, sintiéndose bien. Le dio nueva cita para el 5 de noviembre de 2004, en la cual estando los vendajes y el “Apenrose” secos, se los removieron y le dieron otra cita al apelante, a la cual éste no acudió.
Posteriormente, Ismael Rodríguez visitó la oficina del Dr. Acevedo el 22 de febrero de 2005, con una queja de picor en el cuerpo. El Dr. Acevedo determinó una dermatitis atópica y recetó Benadryl y ordenó una serie de laboratorios. El 1 de marzo de 2004, Ismael Rodríguez regresó a la oficina del Dr. Acevedo con los *661 laboratorios, los cuales reflejaron hiperbilirubinemia y la fosfata alcalina y las encimas hepáticas altas. El Dr. Acevedo ordenó un CT y una monografía, y el 14 de marzo de 2004, Ismael Rodríguez regresó a su oficina, presentando un dolor abdominal, por lo que al otro día se le refirió al Dr. Zaiter para evaluación por servicio de gastroenterología. En esta ocasión, el apelante refirió tener orina oscura, heces fecales claras y amarillas, por tres semanas. El Dr. Quintero diagnosticó una posible lesión al ducto biliar, por lo que lo refirió al Dr. Zaiter.
Una vez el apelante visitó al Dr. Zaiter, éste le ordenó su hospitalización en el Centro Médico. El 5 de agosto de 2005, se le realizó un ERCP en el Hospital Universitario, demostrando obstrucción del ducto biliar común, que no permitió el paso del tinte. El 9 de agosto de 2005, el apelante Ismael Rodríguez fue admitido al servicio de cirugía del Hospital Universitario. Sin embargo, éste no se pudo operar, ya que debido a su creencia religiosa, no se le podía administrar sangre y éste tenía la hemoglobina baja. Estando hospitalizado, se le hizo un drenaje de bilis y se le recetaron antibióticos para evitar que el paciente se pusiese séptico. El 8 de septiembre de 2005, fue admitido nuevamente al servicio del Dr. Lojo en el Hospital Universitario, donde se trató de hacer una exploratoria el 3 de octubre de 2005, la cual fue abortada debido a que no se pudo identificar el ducto común biliar debido a las adherencias. Se recomendó entonces el traslado a un hospital especializado en tratamiento a pacientes de la religión Testigos de Jehová, donde se admitió el 31 de octubre de 2005.
Luego de múltiples exámenes y estudios en el hospital se encontró obstrucción al ducto biliar común debido a adherencias, por lo que se hizo un procedimiento médico conocido como “A Roux-en-Y”, para desviar la bilis del ducto común biliar a otro lugar.
Según el testimonio del Dr. Soltero Harington, perito en cirugía general, éste estuvo de acuerdo con el procedimiento abierto escogido por el Dr. González. También consideró que no se trataba de una operación fácil y que el Dr. González se encontró con una vesícula inflamada y distendida. El Dr. Soltero sostuvo que en la primera operación el Dr. González laceró el ducto común biliar. Sin embargo, no pudo citar nada en los récords que indicase laceración y tuvo que admitir que el biliosa que fue removido en la segunda operación, de alrededor de 200 cc, no representaba ni siquiera la producción de un día de bilis del cuerpo, ya que el cuerpo produce de 800 a 1,000 cc de bilis por día, y que el mismo estaba compuesto de sangre, sanguaza, pus y bilis. Además, el Dr. Soltero sostuvo que era necesario, desde la segunda vez que estuvo hospitalizado el apelante, hacer el ERCP y consultar a un gastroenterólogo.
Ahora bien, a base de la totalidad de la prueba, el foro de instancia considera que fueron adecuados el CT y el HIDA Sean que ordenó el Dr. González, máxime cuando quedó demostrado que luego de drenarse el biliosa, ninguno de los doctores que trataron después a Ismael Rodríguez, ni en ninguno de los estudios realizados se encontró bilis en el lecho hepático. También el foro de instancia entiende que debido a las posibles complicaciones al mismo, no era necesario someter al apelante a este estudio. La prueba en este caso demostró concluyentemente y como cuestión de hecho que los exámenes realizados a Ismael Rodríguez en su segunda hospitalización no reflejaron laceración alguna del ducto común.
Sin embargo, el apelante Ismael Rodríguez sufrió de alguna condición posiblemente provocada por las adherencias que, como admitió el propio Dr. Soltero, son imposibles de controlar. Estas apretaron el ducto, que fue lo que reflejó el ERCP que le realizó el Dr. Lojo once (11) meses después. El Dr. Lojo explicó el procedimiento y el resultado del ERCP. En este estudio se inyectó un tinte y el flujo del tinte se detenía abruptamente y no llegaba al hígado, por lo que hay que concluir la existencia de obstrucción. Se trató de pasar un alambre para tratar de destapar el mismo y ni el alambre logró pasar debido a la estrechez y obstrucción. El Dr. Lojo también testificó que se le hizo un estudio de PTC, prueba que intenta hacer lo mismo que el ERCP, pero en dirección contraria, la cual arrojó el mismo resultado del ERCP, obstrucción total del ducto común biliar.
El Dr. Lojo testificó que la fibrosis es una reacción del cuerpo donde aumentan los fibroplastos, células que *662 son para cicatrizar y que el ducto biliar tiende a crear fibrosis más rápidamente. Entre las razones para que se produzca la fibrosis como indicó el Dr. Lojo, están la raza, la genética, el uso de cauterios, bacterias y piedras de la vesícula grandes, entre otras. También ilustró que no hay forma de parar este proceso normal del cuerpo y no anticipable.
Ante la declaración del Dr. Lojo, el tribunal de instancia preguntó que si cuando no pasó el alambre al hacerle el ERCP, pudieron haber operado en ese momento a Ismael Rodríguez. El Dr. Lojo indicó que había que esperar unos días, como se esperó en este caso, porque el paciente se podía poner séptico. Admitió, además, que no se operó al paciente por ser éste Testigo de Jehová y ante el hecho de que con toda probabilidad fuera necesario una transfusión de sangre.
Según la opinión del Dr. Lojo, a la cual el foro de instancia dio entero crédito, había un espacio entre el sitio donde se encontraba la obstrucción y donde se sacó la vesícula. También tenía adherencias en el cístico y en el radical hepático derecho, donde ambos se unen. No existía en opinión del Dr. Lojo, ninguna anomalía en el cístico.
Por otro lado, también declaró la Dra. Olga Rodríguez, quien fue cualificada como cirujano general. Esta sostuvo que cuando hay obstrucción distal, no cesa el brote de bilis por dos o tres semanas, lo que no ocurrió en este caso. Asimismo, que el ERCP estaba contraindicado en este caso, ya que una de las posibles consecuencias es que puede producir una pancreatitis con efectos mortales. Inclusive, puede ocurrir una perforación del común que llegue hasta el páncreas, y hasta crear hemorragia, riesgos a los que, en su opinión, no se debió exponer al apelante cuando lo atendía el Dr. González.
A base del testimonio de los peritos, el tribunal de instancia concluyó que ante un CT y un HIDA-Scan negativos, con encimas hepáticas y bilirrubina normales, como tenía el apelante Ismael Rodríguez, no era necesario hacerle un ERCP al paciente en su segunda hospitalización. A su vez, que el apelante desarrolló una estrechez en el ducto común por fibrosis, la cual continuó creciendo debido a que las paredes del ducto se van haciendo más gruesas, hasta que se cierra el lúmen. El foro de instancia determinó que el Dr. González en el tratamiento, atención, los procedimientos tanto quirúrgicos como diagnósticos y las consultas realizadas, no se apartó de las normas de la práctica de la medicina. Además, que la prueba presentada no estableció ningún acto negligente del personal paramédico del Hospital Metropolitano Dr. Susoni.
Por lo cual, el foro de instancia procedió a emitir sentencia el 26 de diciembre de 2007, desestimando la demanda en daños y perjuicios instada por el apelante Ismael Rodríguez et al., contra los apelados, Hospital Metropolitano Dr. Susoni y el Dr. González et ais.
Inconforme con tal determinación, el apelante acude ante nos a través del presente escrito, alegando la comisión de varios errores.
II
Expuestos los hechos pertinentes, procedemos a discutir la norma jurídica aplicable.
A
La responsabilidad civil por mala práctica en la medicina
Según dispone el Artículo 1802 del Código Civil, quien por su culpa o negligencia cause daño a otro, tiene el deber jurídico de repararlo. 31 L.P.R.A. see. 5141; Cf. Rodríguez v. Hosp. San Jorge, opinión de 16 de enero de 2007, 2007 J.T.S. 10, pág. 683; Quiñones López v. Manzano Pozas, 141 D.P.R. 139, 176 (1996). La responsabilidad civil por actos de mala práctica de la medicina, debidos a la impericia o negligencia de un facultativo, surge del Artículo 1802 de nuestro Código Civil.
*663 Conforme la norma jurisprudencial, se espera que los médicos ofrezcan a sus pacientes aquella atención médica, cuidados, destrezas y protección que, a la luz de los modernos medios de comunicación y enseñanza, satisfaga las exigencias generalmente reconocidas por la profesión médica. Santiago Otero v. Méndez, 135 D.P.R. 540, 549 (1994); Ramos Robles v. García Vicario, 134 D.P.R. 969, 975-976 (1993).
En los casos de mala práctica, para que proceda la responsabilidad civil del médico, el promovente de la acción tiene la obligación de establecer lo siguiente: 1) la ocurrencia de un acto médico culposo o negligente; 2) la producción de un daño real; y 3) la relación causal entre el acto médico y el daño sufrido. Para ello, es necesario que se presente prueba satisfactoria sobre: 1) las normas mínimas de conocimiento y cuidado médico aplicables a los generalistas o especialistas; y 2) la relación causal entre la actuación u omisión del médico y la lesión sufrida por el paciente. López v. Dr. Cañizares, 163 D.P.R. 119, 133 (2004); Soto Cabral v. ELA, 138 D.P.R. 298, 308-309 (1995).
Cabe señalar que el promovente de la acción de daños y perjuicios por mala práctica deberá establecer mediante preponderancia de prueba, que el tratamiento médico suministrado o la ausencia de uno indicado y correcto, fue el factor que con mayor probabilidad causó el daño sufrido por el paciente. Existe una presunción de que el médico ha ejercido un grado razonable de cuidado y tratamiento adecuado, por lo que el promovente de la acción tiene la obligación de rebatir dicha presunción mediante prueba en contrario que no sea una mera especulación. Santiago Otero v. Méndez, supra; Hernández Rivera v. Municipio de Bayamón, 135 D.P.R. 901, 909 (1994).
La norma que rige en los casos de impericia médica es el estándar de cuidado o buena práctica de la medicina basada en aquella atención que a la luz de los modernos medios de comunicación y enseñanza y conforme al estado de conocimiento de la ciencia y práctica prevaleciente en la medicina, satisface las exigencias generalmente reconocidas por la profesión médica. López v. Dr. Cañizares, supra; Pérez Torres v. Blaudell Ramos, 120 D.P.R. 380 (1988); Márquez Vega v. Martínez Rosado, 116 D.P.R. 397 (1985).
B
Responsabilidad civil de las instituciones hospitalarias
Respecto a la responsabilidad que tienen los hospitales en cuanto a sus pacientes, ha sido y es doctrina firmemente establecida en esta jurisdicción que dichas instituciones le deben a sus pacientes aquel grado de cuidado que ejercería un hombre prudente y razonable en condiciones y circunstancias similares. Márquez Vega v. Martínez Rosado, 116 D.P.R. 397, 404-405 (1985). La visión tradicional de concebir a un hospital como simplemente una estructura dotada de facilidades físicas, personal y equipo para la práctica-de la medicina se ha ido desvaneciendo. Desde años recientes, el deber de cuidado hacia el paciente no sólo corresponde a su médico, sino al hospital. Núñez v. Cintrón, 115 D.P.R. 598, 605 (1984).
A pesar de que el médico no empleado por el hospital pudiera ser considerado como un contratista independiente, no hay duda de que el hospital resulta principalmente beneficiado por la labor que realiza el médico, por lo que la institución debe responder por los actos negligentes de aquél. Márquez Vega v. Martínez Rosado, supra, 408.
C
La evaluación de la prueba pericial y alcances de apelación
La Regla 52 de las Reglas de Evidencia dispone que cuando el conocimiento científico, técnico o especializado sea de ayuda para el juzgador entender la evidencia o determinar un hecho en controversia, un testigo capacitado como perito en relación con la materia sobre la cual va a declarar podrá testificar en forma de opiniones o de otra manera. 32 L.P.R.A. Ap. IV. Por lo cual, el tribunal debe permitir prueba pericial cuando *664 tiene ante sí un asunto cuya cabal comprensión requiere un conocimiento especializado. E.L., Chiesa, Derecho Procesal Penal de Puerto Rico y Estados Unidos, 1993, Vol. III, pág. 451.
Le compete al tribunal de instancia adoptar o descartar el testimonio del perito que se presente al momento de resolver un caso ante su consideración. A tal fin, los tribunales deben considerar: 1) las cualificaciones del perito; 2) la solidez de su testimonio; 3) la confiabilidad de la ciencia o técnica utilizada; 4) la parcialidad del perito. Dye-Tex P.R., Inc. v. Royal Ins. Co., P.R., 150 D.P.R. 658, 664 (2000); E.L. Chiesa, Tratado de Derecho Probatorio; Reglas de Evidencia de Puerto Rico y Federales, San Juan, Publicaciones J.T.S., 1998, T.I, pág. 593. Véase, Regla 53 de Evidencia, 32 L.P.R.A. Ap. IV.
Por último, el tribunal apelativo, en su función revisora, no debe intervenir con la apreciación de la prueba que haga el foro de instancia y con la manera en que dirime la credibilidad de los testigos, en ausencia de una demostración por parte del apelante que hubo pasión, prejuicio, parcialidad o error manifiesto. Colón v. Lotería de P.R., opinión de 20 de abril de 2006, 2006 J.T.S. 74, pág. 1232; S.L.G. Giovanetty v. E.L.A., 161 D.P.R. 492, 518 (2004).
III
Expuesto el derecho, procedemos a su discusión según los errores alegados.
Aplicación de la norma jurídica
A
Como primer error, alega el apelante que el foro de instancia incidió al desestimar su demanda en daños por impericia médica.
No le asiste la razón. El error no fue cometido.
De un minucioso examen del expediente, surge con meridiana claridad que el apelante Ismael Rodríguez no logró demostrar con preponderancia de prueba, que el Dr. González hubiese incurrido en negligencia o impericia médica en el tratamiento, atención, los procedimientos ni en las consultas realizadas. Tampoco logró demostrar que el personal paramédico del Hospital Metropolitano Dr. Susoni, hubiese actuado de manera negligente.
Por el contrario, de la transcripción de la prueba surge que el Dr. González no se apartó de las normas de la práctica de la medicina durante el tratamiento brindado al apelante ni durante los procedimientos tanto quirúrgicos como diagnósticos ofrecidos.
Las' determinaciones de hechos emitidas por el tribunal de instancia en su sentencia desestimando la demanda del apelante, se sustentan con la prueba testifical admitida en evidencia. Por lo cual, hacemos nuestras y acogemos tales determinaciones de hechos emitidas por dicho foro judicial.
Como bien determinó el foro de instancia, el 3 de octubre de 2004, el apelante Ismael Rodríguez fue evaluado por el Dr. González, quien confirmó el diagnóstico de piedras en la vesícula y le recomendó cirugía, explicándole el procedimiento y los posibles riesgos, a lo cual éste consintió. Al día siguiente se realizó la operación al apelante mediante cirugía abierta, quien fue dado de alta por el Dr. González el 9 de octubre de 2004 con cita a su oficina el 15 de octubre del mismo año. En dicha cita, el apelante refirió una queja de dolor abdominal por lo que al día siguiente fue admitido al hospital nuevamente.
Surge de los autos que el Dr. González, sospechando que la herida estaba infectada, ordenó tratamiento con antibióticos y un CT Sean. Encontró inflamación sub-hepática y lo que aparentaba ser una colección de líquidos *665 en el área. Luego de administrar antibióticos por varios días al apelante, el 21 de octubre de 2004 procedió a examinar el área operada, entrando por la misma herida. Encontró una colección de líquidos de alrededor de 200 cc, la cual fue evacuada, dejándose otro “Apenrose” para que drenara cualquier líquido adicional que pudiera llegar al área.
Es un hecho incontrovertido que el paciente mejoró y que el 26 de octubre de 2004, por orden del Dr. González, se le realizó una prueba de radioisótopo llamada HIDA-Scan, que no demostró extravasación del área de la operación. El apelante fue mejorando y fue dado de alta el 27 de octubre de 2004, con cita a la oficina del Dr. González el 29 de octubre de 2004. En dicha visita, el apelante se encontraba en franca mejoría y sintiéndose bien. El Dr. González le dio nueva cita para el 5 de noviembre de 2004, en la cual le removió los vendajes y el “Apenrose”, y le dio otra cita al apelante a la cual éste no acudió.
Precisamente, debido a la omisión por parte del Dr. González en realizarle al apelante un estudio “ERCP” luego de esa segunda operación, es que estriba la alegada negligencia por parte de dicho galeno. Alegadamente tal omisión hubiese evitado en alguna medida la obstmcción del ducto biliar común identificada posteriormente en el apelante. Sin embargo, de la prueba admitida en evidencia surge claramente que tal estudio no era necesario ni hubiese hecho la diferencia en cuanto a la condición del biliosa del apelante. Por el contrario, según uno de los peritos a quien el foro de instancia dio entero crédito, tal estudio era contraindicado en el presente caso y que podría provocar serias complicaciones. Veamos.
Por ejemplo, el Dr. Soltero Harington, perito en cirugía general, admitió que fue adecuado el procedimiento abierto escogido por el Dr. González. También admitió que no se trataba de una operación fácil y que el Dr. González se encontró con una vesícula inflamada y distendida.
De la transcripción de la prueba surge específicamente que el Dr. Soltero no tiene opinión adversa alguna respecto a la primera operación efectuada por el Dr. González al apelante Ismael Rodríguez.

“P Muy bien. O sea, que en esa primera intervención vamos a dejarla aparte porque aquí no...usted no tiene ninguna opinión adversa en cuanto al personal ni en cuanto al cirujano. ¿Correcto?

R Eso es correcto. ”

(T.E. de 25 de septiembre de 2007, pág. 199.)
Ahora bien, respecto a la segunda intervención quirúrgica realizada por el Dr. González, el Dr. Soltero sostuvo que no tenía opinión adversa en cuanto al personal del Hospital y que su única opinión adversa era en cuanto al Dr. González en el manejo del caso, al no ordenar el “ERCP”. Sostuvo específicamente que:

“P Muy bien, vamos a la segunda. En la segunda intervención que son las únicas dos del Doctor Susoni que son las que me interesa a mí.

R Anjá.

P Lo cierto es que tampoco usted tiene una opinión adversa en la segunda intervención en cuanto al personal del Hospital Metropolitano Dr. Susoni, ¿verdad que no?

R No tengo.

P ¿Ninguna?

*666
R Ninguna.

P Okay. Entonces, vamos, doctor, ¿o sea, que aquí su única opinión adversa es en cuanto al cirujano, ...

RAI manejo.

P ... al manejo del cirujano?

R Correcto.

[-]

R Al manejo del caso.

I-.]

P ¿Cuándo no ordenó el “ERCP”?

R Sí, ya eso lo discutimos. ”

(T.E. de 25 de septiembre de 2007, págs. 199-200.)
Sin embargo, posteriormente, el Dr. Soltero, haciendo referencia a la segunda exploratoria realizada por el Dr. González para el drenaje, tuvo que admitir que el “ERCP” no hubiera resuelto nada respecto al bilioma. Veamos.

“P Ese bilioma que había ahí, que estaba...se demostró con un CT, ¿verdad?

RSí.

P El CT demostró y entonces el cirujano abrió...

RSí.

P ...para drenar todo eso.

R Sí, para drenarlo, sí.

P Lo cierto es que el “ERCP” no hubiera resuelto eso.

RNo.

P ¿Verdad que no?

R Verdad que no. ”

(T.E. de 25 de septiembre de 2007, págs. 215-216.)
Asimismo, el Dr. Lojo admitió que al realizar un estudio de “ERCP”, una complicación podría crear pancreatitis. Aceptó, a su vez, que el “ERCP” se trataba de un estudio invasivo.

*667
“P Okey. ¿Y estos estudios también pueden...una complicación puede crear pancreatitis, que usted tenga conocimiento ?

R El PTC no, pero el “ERCP”, sí.

P El “ERCP” sí puede causar...

R Es correcto.

[...]

P ¿Estos estudios, el “ERCP” y PTC, son invasivos?

R Eso se (sic) correcto. ”

(T.E. de 25 de septiembre de 2007, págs. 79-80.)
También la Dra. Olga Rodríguez, quien fue calificada como cirujano general, sostuvo que en este caso en particular el “ERCP” estaba contraindicado.

“P [...] El perito de la parte demandante, doctor Soltero Harrington, declaró que luego de la segunda, intervención del doctor González Amparo había que hacerle un “ERCP ” a don Ismael. ¿ Cuál es su opinión en cuanto a eso ?

R Que no, que el “ERCP” es lo último que uno hace en el...en el...en la evaluación del paciente porque es un método invasivo que puede producir en sí complicaciones.

P ¿Qué complicaciones puede producir un “ERCP”?

R La más frecuente, pancreatitis.

P ¿Y qué es una pancreatitis?

R Una inflamación del páncreas.

P ¿Y cuáles pueden ser los resultados de una pancreatitis?

R Bueno, las pancreatitis pueden ser mortales si es una pancreatitis hemorrágica. O sea, que una pancreatitis pos operatoria...de un pos operatorio inmediato de una vesícula son peligrosas.

P ¿Qué otra complicación puede tener el “ERCP”?

R La otra complicación, pueden tener alergias al tinte, puede tener perforación de la...del común, lo puede perforar, que usualmente lo perforan hacia atrás, produciendo entonces lo que está...lo que está detrás del duodeno es el páncreas. Y puede producir hemorragia también.

P ¿O sea, que el Tribunal puede entender que en su opinión profesional no era necesario hacer un “ERCP”...

R Con pruebas hepáticas normales, con un “H1DA ” negativo y con un CT que no demostraba dilatación de los ductos, no había razón en ese momento de hacer un “ERCP”. Y sise (sic) hubiese hecho iba a ser negativo 
*668
porque en ese momento el ducto no tenía ningún problema.

P ¿Por qué usted dice “en ese momento el ducto no tenía ningún problema”?

R Porque este paciente sigue bien, y viene a tener evidencia de que tiene algún tipo de problema como cinco meses después de la operación. ”

(T.E. de 27 de septiembre de 2007 a la 1:33PM, págs. 164-165.)
Reiterando su posición respecto a la omisión por parte del Dr. González en realizar el estudio “ERCP”, la Dra. Olga Rodríguez sostuvo que:

“R Yo creo que he sido clara que he dicho que en esos momentos no había ninguna necesidad de hacer un “ERCP” porque no había ninguna evidencia de que el paciente tuviese daño al común. Y un “ERCP” se hace no solamente con la intención de hacer un diagnóstico, sino de corregir. [...].

P ¿ Usted tiene alguna condición adicional con relación a este caso que le quiera dar a su Señoría?

R Mi opinión ha sido que el paciente recibió el tratamiento que necesitaba en el momento que lo necesitaba y que se dio de alta bien y que el paciente no volvió a la visita que el doctor le hizo, le dio. ”

(T.E. de 27 de septiembre de 2007 a la 1:33PM, págs. 169-170.)
Asimismo, según alega el apelante, el foro de instancia también se equivocó en su apreciación de laceración y resultante estrechez de su ducto biliar. Sostiene que la prueba estableció la existencia de una laceración a la altura del ducto hepático del apelante Rodríguez González, que al cicatrizar produjo la estrechez del mismo y los resultantes síntomas. Argumenta específicamente en su escrito de apelación, que la prueba presentada sugiere “que lo más probable es que la obstrucción de Don Ismael fue producto de una laceración iatrogénica del ducto [o sea, causada por el cirujano, Dr. González] ”. (Escrito de apelación, pág. 13.)
Sobre el particular, basta con señalar que le correspondía al apelante demostrar con preponderancia de prueba su teoría respecto a que el Dr. González le había lacerado el ducto biliar durante la segunda operación que le realizara. Sin embargo, de la prueba documental y pericial que éste presentara no surge evidencia real de laceración al ducto biliar. Por el contrario, la prueba pericial admitida en evidencia demuestra que la condición de estrechez del ducto biliar del apelante se podía deber a diversas causas, siendo la más probable, que éste sufrió de alguna condición posiblemente provocada por las adherencias, que apretaron el ducto ocasionando tal estrechez que continuó hasta que se obstruyó el ducto.
De un examen de los autos, reiteramos las determinaciones emitidas por el tribunal de instancia, al disponer que:

“21. La prueba en este caso demuestra concluyentemente y como cuestión de hecho que los exámenes realizados a don Ismael en su segunda hospitalización no reflejaron laceración alguna del ducto común.

22. Don Ismael [el apelante], sin embargo, sufrió de alguna condición posiblemente provocada por las adherencias que, como admitió el propio Dr. Soltero, son imposibles de controlar. Estas apretaron el ducto, causando una estrechez en el mismo proceso que continuó hasta que se obstruyó el ducto, que fue lo que reflejó el ERCP que le realizó el Dr. Lojo once meses después. ”

(Sentencia, TPI, Ap. I, pág. 8.)
*669 En resumen, nos es forzoso concluir que no incidió el tribunal de instancia al determinar que el Dr. González no incurrió en conducta negligente ni se apartó de las normas de la práctica de la medicina. Nótese que según la prueba contenida en los autos, la obstrucción al conducto biliar común del apelante, fue debido a adherencias, las cuales según admitió el propio Dr. Soltero, son imposibles de controlar.
Por lo cual, hacemos nuestras las palabras del tribunal de instancia en su sentencia, al expresar que:

“El tribunal determina como cuestión de hecho y de derecho que el Dr. González en el tratamiento, atención, los procedimientos tanto quirúrgicos como diagnósticos, y las consultas realizadas, no se apartó de las normas de la práctica de la medicina.

El tribunal determina como cuestión de hecho, que la prueba presentada no estableció ningún acto negligente del personal paramédico del Hospital Metropolitano Dr. Susoni. ”

(Sentencia de TPI, Ap. 1, pág. 10.)
B
Como segundo error, alega el apelante que el foro de instancia incidió al no permitir contrainterrogatorio del Dr. González respecto a los casos en que ha sido demandado previamente por impericia médica.
Tampoco le asiste la razón.
Conforme surge de la transcripción de la prueba, el tribunal de instancia sí permitió que el representante legal del apelante contrainterrogara al Dr. González sobre las contestaciones que éste había brindado en su solicitud para que le concedieran privilegios en el Hospital Dr. Susoni. Específicamente, le permitió hacer referencia a la pregunta sobre si el Dr. González tenía algún caso de impericia médica pendiente, si había transado alguno o si le habían rendido un veredicto en su contra, a lo cual éste había respondido que no. (T.E. de 27 de septiembre de 2007 a las 10:11 AM, págs. 48-49.) Aunque dicha materia no había formado parte del directo, el foro de instancia la permitió porque “va dirigida exclusivamente a credibilidad del testigo”. (T.E. de 27 de septiembre de 2007 a las 10:11 AM, pág. 50.)
Ahora bien, respecto a la pregunta sobre si a la fecha de 2003 tenía determinada cantidad de casos por impericia médica, el foro de instancia no la permitió por no formar parte del directo. Ante la insistencia del abogado del apelante alegando que tal pregunta también tenía un fin de probar credibilidad del testigo, dicho foro judicial expresó: “Pero es que la credibilidad...mire, ya le contestó [...]”. (T.E. de 27 de septiembre de 2007 a las 10:11 AM, pág. 51.) Es decir, que no había razón en derecho para permitir se contrainterrogara sobre dicho aspecto.
Ante tales circunstancias, el foro de instancia no incidió al declarar con lugar la objeción del abogado de los apelados, por razón de tratarse de materia impertinente que no formó parte del interrogatorio directo. No debemos perder de perspectiva que estamos ante un caso en daños contra el Hospital Metropolitano y el Dr. González, por unos hechos particulares ocurridos durante el proceso de hospitalización y tratamiento del apelante Ismael Rodríguez. El apelante tiene la carga de demostrar con preponderancia de prueba que el Dr. González se apartó de las normas de la práctica de la medicina, al brindarle tratamiento, intervenirlo quirúrgicamente y al diagnosticarlo o en las consultas realizadas, en su caso particular, lo cual no logró demostrar. La alegada prueba sobre demandas previas contra al Dr. González por impericia médica, no hace más o menos probable que haya actuado de manera negligente en este caso en particular.
Las Reglas de Evidencia son claras respecto a las limitaciones del descubrimiento de prueba, disponiendo que la información objeto del descubrimiento no sea privilegiada y que la información sea pertinente a la *670 controversia alegada. Regla 23.1 de Procedimiento Civil, 32 L.P.R.A. Ap. III. E.L.A. v. Casta, 162 D.P.R. 1, 12-13 (2004); García Rivera et al. v. Enríquez, 153 D.P.R. 323, 334 (2001). En cuanto al concepto de pertinencia, éste es mucho más amplio que el establecido en el área de derecho probatorio sobre la admisibilidad de prueba. Por lo tanto, para que una información pueda ser objeto del descubrimiento de prueba, es suficiente que exista probabilidad razonable que la información está relacionada con la controversia. Alvarado v. Alemañy, 157 D.P.R. 672, 683 (2002); Alfonso Brú v. Trane Export, Inc., 155 D.P.R. 158, 174 (2001).
Por último, el tribunal de instancia tiene amplia discreción para pautar los procedimientos sobre descubrimiento de prueba que se van a seguir. Vellón v. Squibb Mfg. Inc., 117 D.P.R. 838, 849 (1986). Por lo cual, ante la ausencia de abuso de discreción por parte del tribunal de instancia, nos es forzoso concluir que no incidió dicho foro judicial al no permitir al abogado del apelante, contrainterrogar al Dr. González sobre determinado aspecto que no formó parte del directo y que es impertinente a la demanda de autos. Además, aun si el error se hubiese cometido, lo cierto es que la “exclusión de evidencia”, en particular la antes discutida, no es “factor decisivo o sustancial” para cambiar el resultado del caso. Regla 5 de Evidencia, 32 L.P.R.A. Ap. IV. Véase, F.D.I.C. v. Caribbean Mktg Inc., Agency, 123 D.P.R. 247, 260 (1989). Si el Dr. González tenía algún otro caso de impericia médica pendiente, ello no era suficiente para impugnar su testimonio sobre el tratamiento que le dio al apelante.
C
Como tercer error, alega el apelante que el tribunal de instancia incidió al conceder el pago de costas a favor del apelado Hospital Metropolitano Dr. Susoni.
No le asiste la razón. Veamos porqué.
Las costas son mandatorias y “le serán concedidas a la parte a cuyo favor se resuelve el pleito [...] excepto en aquellos casos en que se dispusiera lo contrario por ley o por estas reglas”. Los honorarios de abogado, se concederán en aquellos casos en que “cualquier parte o su abogado haya procedido con temeridad o frivolidad” durante el procedimiento. Regla 44.1 de Procedimiento Civil, supra. Véase, Comisionado Electoral P.N.P. v. Presidenta Comisión Local de Elecciones, opinión de 12 de diciembre de 2005, 2005 J.T.S. 194, pág. 653; Auto Servi, Inc. v. E.L.A., 142 D.P.R. 321, 326 (1997).
Según surge del expediente, en la sentencia emitida por el tribunal de instancia desestimando la demanda instada por el apelante Ismael Rodríguez, dicho foro judicial dispuso que:

“El tribunal, en el uso de su discreción y entendiendo que el demandante [apelante] no fuera temerario, no concede ni costas ni honorarios de abogado a la parte demandada [apelada]. ”

(Ap. 1, pág. 19.)
Ahora bien, no estando conforme la parte apelada sobre la no concesión de costas a su favor, procedió a presentar moción de reconsideración en enero de 2008, solicitando su concesión. Sostuvo específicamente que:

“En el presente caso se estuvo litigando por más de cinco (5) años y claramente la parte demandada [apelada] incurrió en altos gastos en la tramitación del pleito; esto sin considerar lo que pagaron los demandados en honorarios de abogado. La Regla 44.1 de las de Procedimiento Civil es clara y dictamina que las costas le serán concedidas a la parte a cuyo favor se resuelva el pleito. ”

(Ap. XV, pág. 84.)
Ante tal solicitud, el foro de instancia procedió a emitir resolución el 11 de enero de 2008, declarando con *671 lugar dicha moción y ordenándole al apelado presentar el memorando de costas en cinco (5) días. (Ap. V, pág. 37.)
Como bien sostuvo el apelado en su moción de reconsideración, la Regla 44.1 de las de Procedimiento Civil es clara respecto a la imposición de costas a la parte perdidosa y no lo deja a la discreción del tribunal. Es un hecho incontrovertido que el apelante Ismael Rodríguez es la parte perdidosa en el presente litigio, por lo cual, conforme a nuestro ordenamiento procesal civil vigente, le corresponde pagar las costas del litigio a favor del apelado Hospital Metropolitano et ais.
Concluimos que no incidió el tribunal de instancia en la imposición del pago de costas al apelante Ismael Rodríguez et al., a favor del apelado Hospital Metropolitano et ais.
IV
Por los anteriores fundamentos de derecho, se confirma en su totalidad el dictamen emitido por el Tribunal de Primera Instancia, Sala de Arecibo.
Lo acordó y manda el Tribunal y lo certifica la Secretaria del Tribunal.
María Elena Pérez Ortiz Secretaria del Tribunal de Apelaciones